**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRANDI ELLIS, JASON FLANDERS, RAMON HERNANDEZ, and JEZLIA BARAJAS,<br><br>Defendants. | Case No. 26-CR-18-JPS<br><br>**ORDER** |

## 1. INTRODUCTION

On February 3, 2026, Defendants Jason Flanders ("Flanders"), Brandi Ellis ("Ellis"), Ramon Hernandez ("Hernandez"), and Jezlia Barajas ("Barajas") were charged together in a fifteen-count indictment. Flanders is charged with committing bank fraud in violation of 18 U.S.C. § 1344(2) (Counts One, Three, and Four) and with making false statements in violation of 18 U.S.C. § 1001 (Count Fifteen). ECF No. 1. Ellis is charged with six counts of bank fraud (Counts Two, Five, Six, Seven, Eight, and Nine), conspiring with Hernandez and Barajas to conceal the nature of the proceeds from the scheme (Count Ten), aggravated identity theft (Count Eleven), wire fraud (Counts Twelve and Thirteen), and witness tampering (Count Fourteen). *Id.* Hernandez and Barajas are each charged with one count of bank fraud (Count Two, Count Seven), and money laundering conspiracy (Count Ten). *Id.*

On February 17, 2026, Flanders filed a motion to dismiss the three counts of bank fraud pending against him. ECF No. 14. On April 20, 2026, Magistrate Judge Stephen C. Dries issued a report and recommendation (the "R&R"), recommending that this Court deny the motion to dismiss. ECF No. 51. Flanders objected to the R&R, ECF No. 52, and the Government responded to the objections. ECF No. 53.

Subsequently, Ellis, Hernandez, and Barajas all filed their own motions to dismiss the bank fraud charges pending against them. ECF Nos. 60, 64, 70. On July 28, 2026, Magistrate Judge Dries issued a combined report and recommendation that this Court deny the three defendants' motions to dismiss. ECF No. 95. Hernandez and Ellis filed objections to the R&R, ECF Nos. 97, 98, and the Government responded to the objections, ECF Nos. 99, 100. For the reasons explained below, the Court will adopt the R&Rs, overrule Flanders', Hernandez, and Ellis' objections, and deny Flanders, Ellis, Hernandez, and Barajas' motions to dismiss.

## 2. STANDARD OF REVIEW

When reviewing a magistrate judge's R&R, the Court is obliged to analyze de novo "those portions of the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id*. The Court's review encompasses both the magistrate judge's legal analysis and factual findings. *See id.*; *see also* FED. R. CRIM. P. 59(b)(2). In turn, "[p]ortions of a recommendation to which no party objects are reviewed for clear error." *United States v. Musgrove*, 845 F. Supp. 2d 932, 937 (E.D. Wis. 2011) (citing *Johnson v. Zema Sys. Corp.*, 170 F.2d 734, 739 (7th Cir. 1999)).

## 3. BACKGROUND

### 3.1 Factual Allegations

In both his R&Rs, Magistrate Judge Dries carefully described all the factual allegations material to defendants' motions. ECF No. 51 at 1–2; ECF No. 95 at 1–3. Flanders acknowledges that "[t]he scheme allegations are not disputed for purposes of this motion." ECF No. 52 at 2. Hernandez and Ellis do not dispute the facts in their objections to the R&R. ECF Nos. 97, 98. The Court has no independent reason to disagree with the factual allegations as laid out by Magistrate Judge Dries. The Court, therefore, adopts the factual allegations as described in the R&R, subject to one caveat, *see infra* note 1, and reproduces them below.

Flanders worked in the finance department at Company A from May 2012 until January 2019, first as the director of finance and later as the chief financial officer. ECF No. 51 at 1 (citing ECF No. 1 at 2). Ellis also worked in the finance department at Company A from February 2014 until May 2024, first as an accountant and later as accounting manager and finance manager. ECF No. 95 at 1. Throughout their employment, Flanders and Ellis had access to the company's accounting system, were able to print checks on the company's accounts, and were authorized to apply the chief operating officer's ("COO") signature to checks issued to vendors for payment authorized by management for work actually performed. ECF No. 51 at 1; ECF No. 95 at 1–2. Flanders and Ellis did not have the authority to issue checks for work that was not performed, to issue checks to themselves, to stamp checks with the COO's signature that were not properly issued pursuant to the company's protocols, or to provide checks issued by the company that the COO did not authorize. ECF No. 51 at 1; ECF No. 95 at 1–2.

According to the Government, Flanders and Ellis used their positions to embezzle the company's money using the following scheme. Flanders created false invoices for work purportedly performed by the company's IT vendor. ECF No. 51 at 1 (citing ECF No. 1 at 4). After receiving approval for those invoices, Flanders caused checks to be issued on the company's account at Bank A, a federally insured financial institution. *Id*. (citing ECF No. 1 at 4, 6). Flanders changed the payee on the checks from the IT vendor to himself and affixed the COO's facsimile signature stamp. *Id*. (citing ECF No. 1 at 4). The COO, however, did not authorize Flanders to place the COO's signature stamp on the checks[1] drawn on the company's account at Bank A and make them payable to Flanders. *Id*. (citing same). Flanders then deposited the checks into his own account or cashed them, thereby converting the proceeds for his personal use. *Id*. (citing same).

Ellis caused checks to be issued on Company A's accounts at Bank A, and made herself the payee on some checks, and Hernandez and Barajas

---

[1]As written, the Indictment, under the "manner and means of the scheme," alleges that: "After receiving approval of those [fake] invoices, Flanders caused checks to be issued on Company A's account at Bank A, payable to Flanders rather than the IT vendor, which checks Flanders endorsed with the signature stamp of Company A's COO." ECF No. 1 at 4. However, the term "endorsed" is inappropriate here, as the key allegation is that Flanders placed the COO's signature, using the COO's stamp, on the check. Endorsement more properly refers to when, at the time of deposit, the payee—not the payor—places their name on the back of the check to indicate that they are the proper payee and authorized to initiate the transfer. *See Indorsement*, BLACK'S LAW DICTIONARY (12th ed. 2014) ("The placing of a signature, sometimes with an additional notation, on the back of an instrument to transfer or guarantee the instrument or to acknowledge payment."); *see, e.g.*, *County of Pierce v. Suburban Bank of Elmhurst*, 815 F. Supp. 1124, 1226 (N.D. Ill. 1993) ("Although the check had been issued to two payees, the collecting bank allowed one of the payees to deposit the check in its account with only the typewritten endorsement of the second payee" (discussing *First Nat'l Bank v. Plymouth–Home Nat'l Bank*, 553 F. Supp. 448, 450 (D. Mass. 1982))).

on others. ECF No. 95 at 2 (citing ECF No. 1 at 4–5). Like Flanders, she affixed those checks with the COO's signature stamp, knowing that they were not authorized by the company and had not been approved by the CEO. *Id.* (citing same). Ellis then deposited the checks, cashed them, or had others do so and give her back a portion of the funds. *Id.* (citing ECF No. 1 at 5). According to the Government, Barajas was not authorized to receive checks from the company for work she did not perform and she and Hernandez knew they were not authorized payees. *Id.* (citing same).

The Government eventually caught on to Flanders' and Ellis' scheme and charged the four defendants together in a fifteen-count Indictment. ECF No. 1. Flanders was charged with bank fraud and lying to investigators. ECF No. 95 at 2–3. Ellis was charged with bank fraud, conspiracy to conceal the nature of the proceeds from the scheme, aggravated identity theft, wire fraud, and witness tampering. *Id.* at 3. Hernandez and Barajas were both charged with bank fraud and money laundering conspiracy. *Id.*

### 3.2 Procedural Background

In February 2026, Flanders moved to dismiss Counts One, Three, and Four of the Indictment on the basis the Government failed to state an offense. ECF No. 14. Magistrate Judge Dries accurately summarized Flanders' argument: Flanders "acknowledges that that [I]ndictment alleges that he made false and fraudulent representations to Bank A." ECF No. 51 at 4. "However," Flanders argues, "those conclusory allegations are contradicted by the[I]ndictment's description of the alleged scheme, which. . . makes clear that all material misrepresentations occurred internally at Company A, and were not passed onto the bank." *Id.* Therefore, according

to Flanders, the Government failed to state an offense as to the bank fraud charges "because the [I]ndictment alleges nothing about the second element of [18 U.S.C.] § 1344(2)," that is, "that he obtained bank property 'by means of' a misrepresentation to a financial institution." *Id.*; *see also United States v. Loughrin*, 573 U.S. 351, 365 (2014) (explaining this requirement in more detail).

Magistrate Judge Dries rejected Flanders' position, concluding that the alleged conduct here "falls squarely within the conduct prohibited by § 1344(2), as defined by *Loughrin*." ECF No. 51 at 5 (citing 573 U.S. 351). According to Magistrate Judge Dries, the checks Flanders presented to the bank contained "at least two lies," namely that Flanders "was a valid payee" and that "the company had authorized and endorsed[2] the payments." ECF No. 51 at 6. It could "reasonably be inferred," he concluded, that these "false statements as to the payee and the signatory induced Bank A to part with the company's money, as the bank would naturally rely on the representations that the checks had been duly issued to Flanders and had been signed and authorized by the company's COO." *Id*. at 5–6. Further, he said, "it's irrelevant that the company, and not the bank, suffered the loss caused by Flanders' alleged fraud." *Id*. at 6 (citing *Loughrin*, 573 U.S. 351). In "terms of the examples provided in *Loughrin*," which the Court will elaborate on momentarily, "Flanders is an alleged check forger, not a handbag swindler." *Id*. (citing same). Taking this view, Magistrate Judge Dries was not persuaded by Flanders' analysis of the three cases. *Id*. at 6–7 (discussing *United States v. Braeger*, No. 21-CR-233, 2023 WL

---

[2] *See supra* note 1.

2136722 (E.D. Wis. Feb. 21, 2023); *United States v. Davis*, 989 F.2d 244 (7th Cir. 1993); and *United States v. Robinson*, 165 F.4th 1043 (7th Cir. 2026)). To bolster his conclusion, Magistrate Judge Dries collected a series of cases from outside the Seventh Circuit that held that "negotiating a forged or altered check constitutes bank fraud under § 1344(2)." *Id*. at 7–8 (collecting cases).

For all these reasons, he recommended that the Court deny the motion to dismiss. ECF No. 51.

In June 2026, Ellis, Hernandez, and Barajas each filed their own motions to dismiss the bank fraud charges pending against them. Magistrate Judge Dries accurately summarized the argument made in each defendant's motion, reflective of Flanders' argument, that "the [I]ndictment alleges nothing about the second element of § 1344(2)." ECF No. 95 at 5. The defendants argue that "the checks at issue here were facially valid" because they "were made payable to real people and contained the genuine signature of Company A's COO." *Id.* While the defendants "acknowledge that the [I]ndictment alleges that Ellis exceeded her authorization when she placed the COO's signature stamp on unauthorized checks," they argue that this is "simply fraud on the company, not the bank." *Id.*

Magistrate Judge Dries stated that he already acknowledged, and rejected, this same argument in his R&R for Flanders' motion to dismiss. Again, he emphasized that "Section 1344(2)'s 'by means of' language is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank . . . to part with money in its control." *Id.* (quoting ECF No. 51 at 4). According to Magistrate Judge Dries, the Indictment clearly alleges "that Ellis forged Company A's checks by affixing the COO's signature" on unauthorized checks and that Ellis presented these forged

checks to Bank A or to third parties like Hernandez and Barajas to do so. *Id.* Using this information, he said that it can be reasonably inferred from these allegations that "the false statement as to the signatory induced Bank A to part with the company's money, as the bank would naturally rely on the representation that the checks had been duly signed and authorized by the company's COO." *Id.* at 5–6.

Magistrate Judge Dries then addressed two ways in which Ellis, Hernandez, and Barajas attempt to distinguish their situation from Flanders'. First, he addressed Hernandez and Barajas' arguments "that the [I]ndictment fails to allege that they played any role in creating the allegedly forged checks." *Id.* at 6. Magistrate Judge Dries called this "a distinction without a difference," and noted that the Indictment alleges that they knew they were not authorized payees, yet they presented checks payable to Bank A. *Id.* (noting that "[i]n other words, they attempted 'to cash, at the teller's window, a forged . . . check'" (quoting *Loughrin*, 573 U.S. at 363)). Magistrate Judge Dries also pointed out that Hernandez and Barajas did not cite any authority that only the forger can be held liable for bank fraud, and that in any event, they are also charged with aiding and abetting liability, and "their knowing participation in and contribution toward the bank fraud scheme is enough to state an offense." *Id.*

Second, Magistrate Judge Dries addressed the defendants' argument that the Government conflated the alleged activities of Ellis and Flanders. *Id.* He noted that while the Government may suggest in its response brief that Ellis altered the payees as Flanders did, "the [I]ndictment does not allege that Ellis altered or forged any payee information." *Id.* Regardless, Magistrate Judge Dries found that this distinction was immaterial because the Indictment alleges that Ellis, Hernandez, and Barajas presented checks

to Bank A that were forged in other ways. *Id.* at 7. Specifically, he noted that the Indictment alleges that Ellis did not have authority "to issue checks for work that was not performed, to issue checks to herself, to stamp checks with the COO's signature that were not properly issued pursuant to the company's protocols, or to provide checks issued by the company that the COO did not authorize" and that the signature stamp is a functional equivalent of a skilled forgery. *Id.* Magistrate Judge Dries found that these lies served as the means of obtaining the bank's property, and that the Indictment thus clearly alleged conduct of bank fraud under *Loughrin*. *Id.* Under this view, Magistrate Judge Dries found the cases that the defendants relied on distinguishable, as in each of those cases the check at issue were executed by authorized signatories. *Id.* at 7–8. Lastly, he addresses Ellis' argument that Count Six in the Indictment fails to state an offense because it does not mention M.I.H. Creations, the entity through which certain proceeds were allegedly laundered. *Id.* at 8. Magistrate Judge Dries found that this did not "doom the indictment" as the Indictment is still facially sufficient and Ellis failed to show any prejudice resulting from the failure to mention M.I.H. in the allegations. *Id.*

For all these reasons, he recommended that the Court deny Hernandez's, Ellis's, and Barajas's motions to dismiss. ECF Nos. 60, 64, 70.

### 3.3 Flanders' Objections

Flanders raises eight objections to the R&R. ECF No. 52 2–10. There are seven[3] that the Court will consider:

---

[3]The eighth argument is that, when one considers that the Government brought this case seven years after the alleged misconduct, together with the five-year statute of limitations for "most federal fraud offenses" and the ten-year statute of limitations for bank fraud, it is obvious "[that] the Government is

- The R&R applies the wrong legal standard by ignoring *Loughrin's* requirement that Flanders' false statement be "the" mechanism for bank fraud. *Id*. at 2.
- The R&R's causal chain is too tenuous to satisfy § 1344's "by means of" language. *Id*. at 3–4 (citing *Loughrin*, 573 U.S. at 365).
- The "Forged Check" conclusion in the R&R is without a factual basis. *Id*. at 4–5.[4]
- The R&R's factual distinction from *Robinson* is untenable. *Id*. at 5–6 (citing 165 F.4th 1043).
- The out-of-circuit cases cited by the R&R are distinguishable and do not override *Robinson*. *Id*. at 9–10.
- The Indictment's own allegations establish that bank property was not the object of the scheme, as required by caselaw. *Id*. at 7 (citing *Davis*, 989 F.2d at 246–47).
- The bank fraud counts cannot be rescued with conclusory allegations by the Government. *Id*. at 8.

### 3.4 Hernandez's Objections

Hernandez objects to the combined R&R as follows. ECF No. 97.

---

using § 1344 beyond its proper scope." ECF No. 52 at 8–9. Because this argument was not made in front the magistrate, *see generally* ECF No. 14, it is waived. *See generally* ECF No. 32; *Mallory v. Rush Univ. Med. Ctr.*, No. 18 C 4364, 2021 WL 458547, at *11 (N.D. Ill. Feb. 9, 2021) (noting that such arguments are "normally waived" (quoting *United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000)). As such, the Court will not analyze the merits of the argument.

[4]As explained later in this Order, the Court liberally construes this objection to include whether the Government alleged any misrepresentations, not just forgery, that would satisfy the statute. *See infra* note 6 and accompanying text.

- The R&R incorrectly concluded that § 1344's "by means of" language was satisfied by the Indictment. *Id.* at 2–3.
- The checks at issue were not forged, and the presentation of the check did not constitute bank fraud "because there was no false statement or other representation which served as *the* mechanism to induce the bank to part with its funds." *Id.* at 3–4.

### 3.5 Ellis' Objections

Ellis objects to the combined R&R as follows. ECF No. 98.

- Her use of a genuine signature stamp does not amount to a forgery or alteration and thus cannot satisfy § 1344's "by means of" language. *Id.* at 2.
- Any fraud against Company A was "incidental" to the bank. *Id.* at 3–4.
- The combined R&R's "makeshift test—that if the bank had called to inquire about the check's validity, they would have discovered they were invalid—is wrong. *Id.* at 1–2.

## 4. LAW AND ANALYSIS

Before providing its analysis, the Court will provide an overview of the legal standard on a motion to dismiss. *See infra* Section 4.1. It will also include a brief overview of the evolution of the criminal statute in question, as that understanding is critical to the analysis. *See infra* Section 4.2. To accomplish the latter goal, the Court will borrow from the discussion Judge Lynn Adelman recently held, *see Braeger*, 2023 WL 2136722, on the bank fraud statute in question. The Court will then provide its analysis of the parties' arguments, where it will explain why it will overrule Flanders',

Hernandez's, and Ellis' objections and will deny each defendant's motion to dismiss. *See infra* Sections 4.3, 4.4, 4.5.

### 4.1 Failure to State an Offense Standard

"[A]n indictment is legally sufficient if (1) it states all the elements of the crime charged, (2) adequately informs the defendant of the nature of the charges against him, and (3) allows the defendant to assert the judgment as a bar to future prosecutions of the same offense." *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013) (citing *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000)). "One that 'tracks' the words of a statute to state the elements of the crime is generally acceptable, and while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *United States v. White*, 610 F.3d 956, 958–59 (7th Cir. 2010) (quoting *Smith*, 230 F.3d at 305). For a defendant to prevail, he "must demonstrate that the indictment did not satisfy one or more of the required elements and that he suffered prejudice from the alleged deficiency." *Vaughn*, 722 F.3d at 925 (citing *United States v. Dooley*, 578 F.3d 582, 589–90 (7th Cir. 2009)). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id*. (quoting *United States v. Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003)).

### 4.2 Bank Fraud Statute

Although only subsection two of the bank fraud statute is at play here, the Court recites the entire bank fraud statute, as it will prove helpful to understand the evolution of the statute.

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—

> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

"[T]he purpose of the bank fraud statute is not to protect people who write checks to con artists," as that is a concern that is traditionally left to state legislatures to regulate, "but to protect the federal government's interest as an insurer of financial institutions." *Braeger*, 2023 WL 2136722, at *4 (quoting *Davis*, 989 F.3d at 246–47). "For years, lower courts struggled over whether[,] in a prosecution under sub. (2)," the relevant statue here, "the [G]overnment had to show intent to defraud the bank and, if not, how to otherwise limit the scope of the statute consistent with its purpose." *Id.* (citing *United States v. Leahy*, 445 F.3d 634, 642–43 (3d Cir. 2006); *United States v. Sprick*, 233 F.3d 845, 852 (5th Cir. 2000); and *United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001)). "The Supreme Court resolved the issue in *Loughrin*, a case in which the defendant used stolen and forged checks to buy merchandise at Target, which he then returned for cash." *Id.* (citing 573 U.S. at 353). "Charged under § 1344(2), Loughrin argued that the [G]overnment should be required to prove intent to defraud the bank, not just Target." *Id.* (citing *Loughrin*, 573 U.S. at 354–55).

"The Court read the statute disjunctively and held that intent to defraud the bank applied to prosecutions under sub.(1), but not sub.(2)." *Id.* (citing *Loughrin*, 573 U.S. at 357–58). "Loughrin argued that, so read, the statute could extend to any fraud in which the victim happens to pay with a check." *Id.* (citing *Loughrin*, 573 U.S. at 361).

> Consider, for example, a garden-variety con: A fraudster sells something to a customer, misrepresenting its value. There are countless variations, but let's say the fraudster passes off a cheap knock-off as a Louis Vuitton handbag. The victim pays for the bag with a good check, which the criminal cashes. Voila!, Loughrin says, bank fraud has just happened—unless we adopt his narrowing construction. After all, the criminal has intended to "obtain . . . property . . . under the custody or control of" the bank (the money in the victim's checking account) and has made "false or fraudulent . . . representations" (the lies to the victim about the handbag).

*Id*. (quoting *Loughrin*, 573 U.S. at 361–62). "The Court acknowledged these concerns but rather than reading an additional element into the statute noted 'a significant textual limitation on § 1344(2)'s reach.'" *Id*. (quoting *Loughrin*, 573 U.S. at 362).

> Under that clause, it is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement. The provision as well includes a relational component: The criminal must acquire (or attempt to acquire) bank property "by means of" the misrepresentation. That phrase typically indicates that the given result (the "end") is achieved, at least in part, through the specified action, instrument, or method (the "means"), such that the connection between the two is something more than oblique, indirect, and incidental. In other words, not every but-for cause will do. . . .
>
> Section 1344(2)'s "by means of" language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control. That occurs, most clearly, when a defendant makes a misrepresentation to the bank itself—say, when he attempts to cash, at the teller's window, a forged or altered check. In that event, the defendant seeks to obtain bank property by means of presenting the forgery directly to a bank employee. But no less is the counterfeit check the "means" of obtaining bank funds when a defendant like Loughrin offers it as payment to a third party like Target. After all, a merchant accepts a check only to pass it along to a

> bank for payment; and upon receipt from the merchant, that check triggers the disbursement of bank funds just as if presented by the fraudster himself. So in either case, the forged or altered check—i.e., the false statement—serves in the ordinary course as the means (or to use other words, the mechanism or instrumentality) of obtaining bank property. . . .
>
> By contrast, the cases Loughrin hopes will unnerve us—exemplified by the handbag swindle—do not satisfy § 1344(2)'s "means" requirement. Recall that in such a case the check is perfectly valid; so the check itself is not (as it was here) a false or fraudulent means of obtaining bank money. And the false pretense that has led, say, the handbag buyer to give a check to the fraudster has nothing to do with the bank that will cash it: No one would dream of passing on to the bank (as Target would forward a forged check) the lie that a knock-off is a Louis Vuitton. The bank's involvement in the scheme is, indeed, wholly fortuitous—a function of the victim's paying the fraudster by (valid) check rather than cash. Of course, the bank would not have disbursed funds had the misrepresentation never occurred, and in that sense, the lie counts as a but-for cause of the bank's payment. But as we have said, § 1344(2)'s "by means of" language requires more: It demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money. And in cases like the handbag swindle, where no false statement will ever go to a financial institution, the fraud is not the means of obtaining bank property.

*Id*. (quoting *Loughrin* 573 U.S. at 362–65).

### 4.3 Flanders' Objections

The Court will now address each of Flanders' objections in turn. The Court starts with Flanders' objection that "the R&R used the wrong legal standard by ignoring *Loughrin's* requirement that [his] false statement be 'the' mechanism for fraud." ECF No. 52 at 2–3; *see also id*. at 2 n.1 (collecting caselaw that regards the word "the" as limited to a reference of just one

item). Flanders spills much ink explaining why the "false statement cannot be one of the several links in a chain inducing the bank to part with money—it must be '*the*' mechanism—*the* defining factor that is both material and is *the* mechanism naturally inducing a bank (or custodian) to part with its money." ECF No. 52 at 2 (quoting *Loughrin*, 573 U.S. at 365); *Loughrin*, 573 U.S. at 365 ("§ 1344(2)'s 'by means of language' . . . demands that the defendant's false statement is *the* mechanism naturally inducing a bank (or custodian) to part with its money."). However, the statute itself never uses the phrase "by *the* means of." *See* 18 U.S.C. § 1344(2). And, as Flanders' detailed footnote acknowledges, what matters here is the word choice that Congress, not the Supreme Court, made. ECF No. 52 at 2 n.1 ("Congress use[s] the definite article 'the," so we conclude that . . . ." (quoting *Reid v. Angelone*, 369 F.3d 363, 367 (4th Cir. 2004)); *id*. (collecting cases that rely on Congress' word choice).

True enough, Flanders relies on the phrasing provided by the Supreme Court of the United States, not just any court, to reach this conclusion. But this Court, when considering the rest of the *Loughrin* opinion, does not discern that the Supreme Court suggested the limitation to § 1344(2) that Flanders proposes. Consider that the Supreme Court, earlier in *Loughrin*, provided the following definition:

> That phrase ['by means of'] typically indicates that the given result (the 'end') is achieved, at least in part, through the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental . . . . In other words, not every but for-cause will do.

573 U.S. at 363 (internal citations omitted). In this Court's view, the Supreme Court's alternative phrasing—"[n]ot every but-for cause will do"—shuts

the door on some possibilities but ultimately does not limit the number of possibilities to just one as Flanders suggests. This Court's view is consistent with the way the Supreme Court has discussed but-for cause as a general matter. *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) ("Often, events have multiple but-for causes."); *cf. Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014) ("The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013))); *see also Comcast Corp. v. Nat'l Ass'n of African-American-Owned Media*, 589 U.S. 327, 333 (2020) (noting that a "plaintiff bears the burden of showing that race was *a* but-for cause of its injury" in 42 U.S.C. § 1981 cases) (emphasis added)). This view is also consistent with how the Supreme Court has interpreted a similar phrase—"by reason of"—in other criminal contexts. *See, e.g.*, *Burrage v. United States*, 571 U.S. 204, 213 (2014) (noting that, in the context of the Racketeer Influenced and Corrupt Organizations Act, the phrase "by reason of" necessitates "a showing that the defendant's violation" was, among other things, "*a* 'but for' cause of his injury" (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265–68 (1992) (emphasis added))); *Bridge v. Phx. Bond & Indemnity Co.*, 553 U.S. 639, 654 (2008) (same); *see also Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009) (same, but in the context of a civil case for disparate treatment (citing *Bridge*, 553 U.S. at 652–55)).

The Supreme Court's concluding statement in *Loughrin* further undermines Flanders' position that there may be only one cause. 573 U.S. at 366 ("And Loughrin's own crime, as we have explained, is one such scheme, because he *made false statements*, in the form of forged and altered

checks, that a merchant would, in the ordinary course of business, forward to a bank for payment." (emphasis added)). And, in the penultimate paragraph, what the *Loughrin* Court writes all but dismantles Flanders' suggestion. *Id.* at 364. ("Of course, the bank would not have disbursed funds had the misrepresentation never occurred, and in that sense, the lie counts as *a* but-for cause of the bank's payment." (emphasis added)). Accordingly, this Court is not persuaded that the R&R applied the wrong legal standard.

At the same time, this Court can appreciate that § 1344(2) "'by means of' language requires more" than a situation involving the hypothetical handbag swindle, *id.* at 365, that this Court earlier discussed. *See supra* Section 4.2. As such, this Court will still entertain Flanders' second objection that the allegations here are too tenuous to satisfy this language. However, contrary to Flanders' position, ECF No. 52 at 3, the facts here are dissimilar to the other hypothetical postulated in *Loughrin* wherein a woman claims to have "crossed the Rockies by means of a car" because she traded in her car for a bicycle and rode that bicycle across the Rockies. 573 U.S. at 364. This hypothetical is not like the alleged facts here because Flanders is not said to have swapped out the blank check for another instrument, say, by trading the blank check for cash with a third party. This lack of "intermediate step" is important because if there was an intermediate step, the Government would likely need more to satisfy the "by means of language." *See Robinson*, 165 F.4th at 1049 (noting that "the government never explains why the intermediate step"—wherein the victim paid by

check—"implies that a false statement went to the bank").[5] Flanders' argument that there was an intermediate step in the form of false invoices that were "directed entirely at Company A's internal approval process" is misleading, as it ignores the two lies that he made to the bank, which the Court will discuss in more detail momentarily. Accordingly, the Court finds the Rockies hypothetical inapposite here.

Flanders' third objection—that there were no factual allegations from which to conclude that there were no false or fraudulent pretenses or other misrepresentations—is also unpersuasive.[6] ECF No. 4–5. As Magistrate Jude Dries correctly noted, the checks Flanders presented to the bank allegedly contained "two lies," one that he "was a valid payee" and another that "the company had authorized . . . the payment." ECF No. 51 at 6; *see supra* note 1 (explaining why the omitted verb, "endorsed," is the improper term). Indeed, the lies that Flanders allegedly made here mirror, in all material respects, those underlying the conviction in *Loughrin*:

---

[5]This intermediate-step analysis is also applicable to the Flanders' later objection disputing the R&R's handling of *Robinson*.

[6]Flanders' third objection seems to be a challenge specific to the "'Forged Check' conclusion in the R&R," but the statute does not require that there be a forgery. *See* 18 U.S.C. § 1344(2). Rather, it requires that there be "false pretenses" or "fraudulent misrepresentations." *See id*. As such, the Court construes Flanders' third objection more generally—namely, whether there are *any* factual allegations, including the alleged forged check, that satisfy those broader parameters. *Cf. Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 158–61 (Bankr. N.D. Ill. 2009) (in the context of § 523(a)(2)(A) violations by debtors in bankruptcy, "[f]alse pretenses do not necessarily require overt misrepresentations" because "omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor" (quoting *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996)).

> Petitioner Kevin Loughrin executed a scheme to convert altered or forged checks into cash. Pretending to be a Mormon missionary going door-to-door in a neighborhood in Salt Lake City, he rifled through residential mailboxes and stole any checks he found. Sometimes, he washed, bleached, ironed, and dried the checks to remove the existing writing, and then filled them out as he wanted; other times, he did nothing more than cross out the name of the original payee and add another. And when he was lucky enough to stumble upon a blank check, he completed it and forged the accountholder's signature. Over several months, Loughrin made out six of these checks to the retailer Target, for amounts of up to $250. His *modus operandi* was to go to a local store and, posing as the accountholder, present an altered check to a cashier to purchase merchandise. After the cashier accepted the check (which, remarkably enough, happened time after time), Loughrin would leave the store, then turn around and walk back inside to return the goods for cash.

573 U.S. at 353 (internal citations omitted). Here too, Flanders (allegedly) falsely inserted his name on the payee line and, without authorization, placed the firm's name (or its representative's name) on the signatory line to indicate the firm's authorization. Flanders may not have used his own handwriting as Loughrin presumably did (given the allegation that he stole physical checks out of mailboxes) to the sign the checks, but that was only because, to borrow the words of the Supreme Court, he was "lucky enough" to have the facsimile signature stamp of the COO. *See id.* Similarly, Flanders need not have taken out a pencil and eraser, as Loughrin sometimes had to, to alter the check's payee line because Flanders had access to "blank check[s]" in the first instance (due to his role at the company), a circumstance that Loughrin was "lucky enough" to come across only sometimes. *Id.* As such, the Court finds the factual predicate for Loughrin's conviction akin to the allegations here.

Flanders' argument that there were no alleged misrepresentations to a bank is, therefore, unpersuasive, as is his related argument that the facts here are analogous to the handbag swindler. *See id.* at 364 ("Recall that in" the case of the handbag swindler "the check is perfectly *valid*"); *see supra* Section 4.2 (discussing the handbag swindler example). After all, unlike the allegations here, the handbag swindler's misrepresentation is confined to the value of the bag, whereas, in this case, there are misrepresentations on the face of the check itself. And, as will be made even clearer later, it is irrelevant if the checks *appear* valid on their face. *United States v. Guy*, No. 24-5677, 2025 WL 398678, at *5 (6th Cir. 2025) ("Whether Guy used a valid check from an account she was unauthorized to access or manually altered a check is immaterial; both actions are fraudulent. Guy knew she did not have authorization to access SI Miami's bank accounts, which makes her tender of the check to the dealership fraudulent.").

Yet, Flanders insists that it matters that Bank A "had no independent means of knowing whether the COO had authorized Flanders to use the stamp on this particular check" and that Bank A "would have processed the identical check whether the stamp had been used with the COO's blessing or without it." ECF No. 52 at 4. In Flanders' view, because the information relating to the company's internal authorization procedures was "invisible" to the bank, it cannot be said that his misrepresentations were the mechanism of the bank fraud. *Id*. at 4–5 (citing *United States v. Martín-Alfaro*, 553 F. Supp. 3d 1, 3 (D.P.R. 2021)).

While the Court appreciates that it may still be the case that an affirmative misrepresentation is required to convict under § 1344(2), *United States v. LeDonne*, 21 F.3d 1418, 1427 (7th Cir. 1994), Flanders points to no cases that suggests the two alleged lies here, namely the unauthorized use

of the COO's signature and the fabricated payee line, cannot be so characterized. Nor does Flanders suggest that such misrepresentations are not material, as required by relevant caselaw. *Davis*, 989 F.2d at 247 (citing *United States v. Swearingen*, 858 F.2d 1555, 1556–58 (11th Cir. 1988) (per curiam) and *United States v. Staniforth*, 971 F.2d 1355, 1357–58 (7th Cir. 1992)). Indeed, the Court's research has produced caselaw that suggests the opposite. *See United States v. Kain*, 149 F.3d 1192 (Table), 1998 WL 327865, at *3 (10th Cir. June 18, 1998) ("This circuit has concluded that a defendant's misrepresentation to a bank that he or she is authorized to engage in a particular transaction may constitute a violation of § 1344(2)." (citation omitted)); *United States v. Young*, 952 F.2d 1252, 1255–57 (10th Cir. 1991); *United States v. Briggs*, 939 F.3d 222, 227 (5th Cir. 1991) (If "the defendant" were to "falsely represent[] that she is acting under her employer's authority, we would have little trouble concluding that such conduct is squarely prohibited" by § 1344(a)(2)); *United States v. McCauley*, 253 F.3d 815, 819 (5th Cir. 2001) (same); *United States v. Tann*, 425 F. Supp. 2d 26, 32 (D.C.C. 2006) ("[T]he 'payee' line is the key line affecting the rights of all parties to the commercial paper; without a named payee, a check would affect no legal rights or liabilities."); *id.* (noting that the legal rights of the defendant's "employer's bank" were affected insofar as it "was on the hook by action of commercial law for cashing a fraudulent check"). As such, the Court does not find Flanders' third objection—that there are no factual allegations to show that he presented any material falsehoods to Bank A—to be persuasive.

As to his fourth objection—that there would be an infringement of "state criminal jurisdiction" if the Court were to uphold the R&R's distinction from *Robinson*—the Court is similarly not persuaded. ECF No.

52 at 6 (citing 165 F.4th 1043). *Robinson* involved a kickback scheme wherein defendants "made false representations" in the form of false invoices for repairs at tenant properties "so that the Housing Authority would cut checks to their co-conspirator contractors." 165 F.4th at 1046, 1049. Here, by contrast, there was, as suggested earlier, *see supra* note 5 and accompanying text, no intermediate step. Under these facts, therefore, the Government need not have come forth with *more* allegations that "implie[d] that a false statement went to [a] bank," as was the case in *Robinson*. 165 F.4th at 1049. To the extent that Flanders seeks to revive *Robinson*'s relevance in this case by suggesting that that case involved "structurally identical . . . authorization defects," ECF No. 52 at 6, the Government correctly suggests, and the rest of this Order confirms, that nothing turns on these facts. ECF No. 53 at 15 (arguing that the "operative question in both cases had little to do with authorization structures"). Since the alleged false statements in this case reached the bank, "[t]he premise of [Flanders'] federalism argument," to borrow from *Loughrin*, "thus collapses." 573 U.S. at 365. For these reasons, the Court is not persuaded by Flanders' fourth objection. By extension, Flanders' fifth objection—that the out-of-circuit cases are inapposite and do not override *Robinson*—is also not persuasive.

However, Flanders' sixth objection—that the Indictment's own allegations establish that bank property was not the object of the scheme—gives the Court pause. On its face, this objection poses a legal question the *Loughrin* court squarely resolved against Flanders: the Government need not prove an intent to defraud a federally insured bank. 573 U.S. at 356–57. In substance, however, the objection that Flanders raises is whether the statute requires that a "defendant . . . intend to cause a bank a loss or potential liability," such as a victim suing to recover losses due to the bank's

processing of a forged instrument. *United States v. Thomas*, 315 F.3d 190, 201 (3d Cir. 2002); ECF No. 52 at 7 (suggesting that because the checks were facially valid, Bank A was a holder in due course and was, therefore, never at risk of loss). Unfortunately, the parties have not sufficiently developed this issue, but because of its importance, the Court provides the following analysis.

As a starting point, some courts have held that § 1344 is designed to "allay crimes that undermine[] public confidence in banking institutions," leaving such courts to conclude that it matters whether the defendant's fraud targets the bank's integrity or otherwise exposes the bank to lawsuits from victims. *See, e.g.*, *Thomas*, 315 F.3d at 200 (citing *United States v. Blackmon*, 839 F.2d 900, 906 (3d Cir. 2002)). The Seventh Circuit in *Davis* adopted such a view, suggesting the Government must establish that a defendant's conduct reveals an intent to expose the bank to risk of a civil suit. *See* 989 F.2d at 246–47.

Adopting a similar view, the Third Circuit in *Thomas* suggested, as relevant here, that a case where a defendant "conspicuously forged or altered checks" by, for instance, scratching off the person designated on the payee line, can be distinguished from a situation like this one where the victim "entrusted the defendant with signed checks with the payees [line] left blank." 315 F.3d at 200–01; *see also United States v. Rodriguez*, 140 F.3d 163, 168–69 (2d Cir. 1999) (making a similar distinction in a case involving phony vendor invoices that resulted in the company generating checks payable to defendant that bore the authorized signature of the company treasurer). As the *Thomas* court explained:

> There is no meaningful difference between the situation [in which the employee is entrusted with signed checks] and one

> in which an employer gave an employee keys to its cash box. On the other hand, when an employee cashes some employer's forged checks, he or she harms the bank. The public expects that a properly completed check will not be used by other than its intended beneficiary and that banks ought to be vigilant of forged or altered checks, and civil liability reflects this public expectation. "The purpose of the Commercial Code is to enhance the marketability of negotiable instruments and to allow bankers, brokers, and the general public to trade in confidence." *Manor Bldg. Corp. v. Manor Complex Assocs., Ltd.*, 645 A.2d 843, 846 (Pa. Super. Ct. 1994). The law governing bank liability for paying on a fraudulent negotiable instrument thus serves to vouchsafe public confidence in the banking system. However, the public is unlikely to lose confidence in a financial institution because it honors checks that some individuals foolishly have allowed others to complete.

315 F.3d at 201; *id.* at 199 ("Money is taken from banks every day for countless foolish purposes, but in such instances, banks are not exposed to liability nor is their integrity compromised."). With this context, the Court returns to the question Flanders poses here: can a bank fraud be said to have occurred if, under the scheme, the bank could not be found civilly liable for failing to detect the scheme and the public's confidence in the banking system's integrity is otherwise unaffected?

The Seventh Circuit in *Davis*, as Flanders points out, suggests that the answer to that question, as a general matter, is no. ECF No. 52 at 7 (citing 989 F.2d at 246–47) ("As a holder in due course of the IRS's check—a negotiable instrument that had not been forged or stolen—the bank took free of any defenses that the IRS might have had to a suit by the payee (Williams) or other holders") (internal citations omitted); *id*. at 247 (finding that the statute's purpose "is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of

financial institutions" and that its allegations did not fit this bill). One may, therefore, read *Davis* as suggesting that "if a defendant takes money that is under the bank's custody but does not belong to the bank, and in so doing does not subject the bank to any risk of losing its own funds, he has not threatened this interest and[,] therefore[,] has not committed bank fraud." *Leahy*, 445 F.3d at 665 (Becker, J., concurring and dissenting).

However, more than three decades have passed since *Davis* was decided, and in that time, the Supreme Court has quietly weighed in on this issue, noting that courts need not worry about the bank's legal exposure in § 1344(2) cases and by extension, the public's confidence in the system. In a footnote, the *Loughrin* court declined to credit petitioner's "last-gasp" argument that § 1344(2) requires "the Government to prove that the defendant's scheme created a risk of financial loss to the bank." 573 U.S. at 366, n.9. It reasoned that:

> [N]othing like that element appears in the clause's text. Indeed, the broad language in § 1344(2) describing the property at issue—"property owned by or under the custody or control of" a bank—appears calculated to avoid entangling courts in technical issues of banking law about whether the financial institution or, alternatively, a depositor would suffer the loss from a successful fraud. And Loughrin's argument fits poorly with our prior holding that the gravamen of § 1344 is the "scheme," rather than "the completed fraud," and that the offense therefore does not require "damage" or "reliance."

*Id*. (first quoting *United States v. Nkansah*, 699 F.3d 743, 754 (2d Cir. 2012) then quoting *Neder v. United States*, 527 U.S. 1, 25 (1999)). To the extent Flanders might argue that this footnote says nothing about whether the Government needs to nonetheless prove an *intention* to cause financial loss, the Court would not be so persuaded. After all, the Supreme Court in *Shaw v. United States* held that the text of the companion bank fraud provision, 18

U.S.C. § 1344(1), "demands neither a showing of ultimate financial loss *nor a showing of intent to cause financial loss*." 580 U.S. 63, 63 (2016) (emphasis added). Similarly here, the text of § 1344(2) imposes no such requirement. *See generally* 18 U.S.C. § 1344(2). And, to borrow from *Loughrin*, the lack of such a requirement is consistent with the reality that "the gravamen of § 1344(2) is the 'scheme,' rather than 'the completed fraud.'" 573 U.S. at 366, n.9.

Therefore, to the extent that the Seventh Circuit has required that the Government must show that a defendant, in fact, caused a financial loss — or otherwise intended to do so—to state an offense of bank fraud, *Davis*, 989 F.2d at 246–47, the Court finds that the Seventh Circuit has been overruled by *Loughrin*. To be sure, if courts are not to entangle themselves in the technicalities of banking law, it would not make sense to require them to take up the separate legal question of whether, under the alleged fraudulent scheme, the bank would take as a holder in due course, free of any defenses.[7] To hold otherwise would require contravening the *Loughrin* Court's interpretation of § 1344(2). *See Guy*, 2025 WL 398678, at *5 (rejecting as immaterial defendant's suggested distinction between a facially valid check and forged check). For these reasons, the Court is not persuaded by Flanders' objection that the bank was not the object of the scheme.

Turning to Flanders' last objection—that the Indictment provides only legal conclusions—the Court is again not persuaded. As the Court

---

[7]To this point, the *Davis* court itself could not even say with certainty whether the bank took the check in due course. 989 F.2d at 247 ("Maybe, as we suggested earlier, the bank wasn't really a holder in due course and hence was put at risk, but the government failed to establish this.").

earlier explained, the Indictment alleged affirmative misrepresentations, contrary to Flanders' suggestion. ECF No. 52 at 8 (disputing the presence of an "actual communication from Flanders to Bank A" or a "statement of fact that Bank A received and acted upon").

For all these reasons, the Court finds that the Government states an offense as to all three counts of bank fraud. Accordingly, Flanders' objections to Magistrate Judge Dries' R&R will be overruled, the R&R will be adopted, and Flanders' motion to dismiss will be denied.

### 4.4 Hernandez's Objections

Hernandez argues that the "by means of" language is not satisfied by the Indictment because his false statement was "not the mechanism which naturally induced the bank to part with its money." ECF No. 97 at 2 (citing *Loughrin*, 573 U.S. at 363). He makes the same argument as Flanders in that "[t]he bank would have processed the check, no matter whether it had a stamp which was duly authorized by the COO, or it did not carry his/her blessing." *Id.* at 3. As the Court previously found with Flanders, this argument is without merit. The statute does not ask whether the bank would have deposited the check if it knew the check was not truly authorized. Further, as Magistrate Judge Dries suggests, ECF No. 95 at 8, it seem obvious that the bank would not have deposited the check had it known it was unduly authorized. If the Court followed Flanders' or Hernandez's logic, challenges for fraud would never succeed. The Indictment clearly alleges that Hernandez knew that he was not an authorized payee and presented checks that were falsely authorized by the COO. ECF No. 1 at 8. The Court finds that this is enough to sufficiently allege a violation of § 1344(2). Hernandez's misrepresentations, holding

himself out as an authorized payee and presenting a check with an alleged false authorization from the COO, is clearly the kind of misrepresentation that would induce a bank into thinking a truly invalid check was valid and thus deposit it. Thus, the Court agrees with Magistrate Judge Dries on this point.

Hernandez also objects on the basis that the checks were not forged because "there is a significant difference between the unauthorized use of a company stamp, and an actual forgery where the signature is not authorized" and therefore the alleged fraudulent conduct "did not constitute a material, false representation." ECF No. 97 at 3–4. Hernandez, Ellis, and the Government all waste their time in discussing whether a stamped signature amounts to "forgery." That issue is immaterial to the question at hand.[8] The question is whether the check Hernandez presented included "false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2). While Hernandez may not have been the one to create the allegedly false checks, he did make the alleged misrepresentations. Further Hernandez's reliance on *Robinson*, ECF No. 97 at 3–4, does not support his argument. As the Court has previously discussed and as Magistrate Judge Dries notes, *Robinson* is distinguishable based on the alleged invalidity of the check. ECF No. 95 at 7–8.

Accordingly, the Court will overrule Hernandez's objections, adopt the combined R&R, and deny Hernandez's motion to dismiss.

---

[8]*See supra* footnote 6.

### 4.5 Ellis' Objections

For the same reasoning as provided above, the Court will also overrule Ellis' objections. The Court will begin with Ellis' argument that her conduct does not satisfy the "by means of" language because she was authorized to use the COO's genuine signature stamp. ECF No. 98 at 2. The Court agrees with Magistrate Judge Dries' analysis: while Ellis may have been authorized to use the COO's signature stamp, she was not authorized to use the stamp on the alleged invalid checks at hand, as the Indictment alleges. ECF No. 1 at 8. Further, Ellis relies on cases that are both not binding on this Court and not persuasive.

As both Magistrate Judge Dries and the Government point out, all the cases Ellis points to are factually distinguishable. ECF No. 95 at 7–8; ECF No. 100 at 7–9. In *United States v. Cocilova*, the court found that there was no evidence that the signatures on the checks themselves were forged and thus the signatures were valid, even if obtained via the defendant's deceptive actions. 584 F. Supp. 2d 885, 892 (W.D. Va) (2008). In contrast, the Indictment here does not allege that Ellis obtained the COO's signature, even if deceptively, but that she used a signature stamp for an inherently invalid purpose.

Similarly, in *United States v. Thomas*, a victim was tricked into placing their real signature on a check. 315 F.3d at 194. Thus, while the authorization was procured by fraud, it was still authorized. *Id.* at 202. Again, that is not the same conduct Ellis allegedly undertook. *United States v. Laljie* is distinguishable for the same reasons. In *Laljie*, the defendant used pre-signed checks from the victim to pay her own bills. 184 F.3d 180, 184 (2nd Cir. 1999). Thus, while the defendant may have used the checks for an

invalid purpose, the signature itself was not unauthorized. *Id.* at 190. Again, the alleged conduct here is different. The Indictment alleges that signature stamp Ellis used was for an invalid purpose, and thus there was no authorized signature at all.

The Court will now address Ellis' second argument, that any fraud was incidental to the bank. Ellis argues that the checks at hand could only amount to fraud against the employee because the bank relied on a genuine signature. ECF No. 98 at 3. The Court has already addressed this argument, *see supra* 4.3 and 4.4, and for the reasoning explained above, this argument fails. The Indictment alleges that Ellis was not using a duly authorized signature and thus making a misrepresentation to the bank itself. Thus, the alleged fraud was not "merely incidental" as Ellis suggests.

Ellis's last objection is that the combined R&R incorrectly adopted a "makeshift test" that "[I]f Bank A had called Company A to inquire about the validity of the checks, surely the company would have said that the checks were unauthorized. The checks were (allegedly) invalid on their face." *Id.* at 1–2 (quoting ECF No. 95 at 8). Even if the Court were to ignore this statement, Magistrate Judge Dries' analysis stands. The Court has already disposed of the argument that the alleged misrepresentation did not need to be readily available to the bank for the reasons describe above.

For all these reasons, the Court will overrule Ellis' objections.

Ellis does not object to the portion of the combined R&R where Magistrate Judge Dries discussed the viability of Count Six of the Indictment. ECF No. 95 at 8. Reviewing this portion for clear error, the Court finds none. The test for a valid indictment "is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v.*

*Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003) (quoting *United States v. Allender*, 62 F.3d 909, 914 (7th Cir.1995)). The Court finds no clear error in Magistrate Judge Dries' finding that Count Six meets this standard.

The combined R&R does not address Ellis' request to strike language from Count Ten of the indictment that references bank fraud. ECF No. 64 at 11. Because the Court has found that the Indictment as it pertains to Ellis does state an offense for bank fraud in violation of § 1344, it will also deny Ellis' request to strike language referencing bank fraud from Count Ten.

### 4.6 Barajas' Motion

Barajas did not object to the combined R&R. Because the Court has now reviewed the combined R&R's portion of the analysis that relates to Barajas de novo, the Court finds that the combined R&R's discussion as it pertains to Barajas meets the less demanding standard of clear error.[9] Accordingly, the combined R&R will be adopted as to Barajas, and her motion to dismiss will be denied.

## 5. CONCLUSION

For the foregoing reasons, the Court will overrule Flanders', Hernandez's, and Ellis' objections, adopt both of Magistrate Judge Dries' Reports and Recommendations, and deny each defendant's individual motion to dismiss.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Stephen C. Dries' Report and Recommendation, ECF No. 51, be and the same is hereby **ADOPTED**,

---

[9]Barajas made the same argument as her fellow defendants in her motion to dismiss that her alleged conduct did not amount to fraud on the bank itself. ECF No. 72.

and Defendant Jason Flanders' objections thereto, ECF No. 52, be and the same are hereby **OVERRULED**;

**IT IS FURTHER ORDERED** that Defendant Jason Flanders' motion to dismiss Counts One, Three, and Four of the Indictment, ECF No. 14, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that that Magistrate Judge Stephen C. Dries' Report and Recommendation, ECF No. 95, be and the same is hereby **ADOPTED,** and Defendant Ramon Hernandez's objections thereto, ECF No. 97, and Defendant Brandi Ellis' objections thereto, ECF No. 98, be and the same are hereby **OVERRULED**;

**IT IS FURTHER ORDERED** that Defendant Ramon Hernandez's motion to dismiss Counts Two and Ten of the Indictment, ECF No. 60, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Brandi Ellis' motion to dismiss Counts Two, Five, Six, Seven, Eight and Nine of the Indictment, and to strike from Count Ten language referencing bank fraud, ECF No. 64, be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Defendant Jezlia Barajas' motion to dismiss Counts Seven and Ten of the Indictment, ECF No. 70, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 29th day of October, 2026.

BY THE COURT:

J. P. Stadtmueller

U.S. District Judge